## ESTATE OF CHRISTIAN NAGLE, DECEASED.

APPEAL BY PRISCILLA HESS ET AL. FROM THE ORPHANS' COURT OF NORTHAMPTON COUNTY.

$\frac{134}{\text{f } 28 \text{ SC}} \frac{31}{1630}$

Argued March 13, 1890—Decided March 31, 1890.
[To be reported.]

1. In the absence of evidence to the contrary, the maker of negotiable paper is presumed to have issued it clear of all blemishes, erasures and alterations; and the burden of showing that a blemished instrument was defective when issued, is upon the holder, notwithstanding the presumptions in favor of innocence, or the fact that the original parties to it are dead.

2. When it is apparent upon the face of a note or bank check that the paper, at the place where the date or the amount of it is written, is so defaced as to remove the sizing and a part of the surface, and the date or amount is afterward written therein, it is unnecessary that the paper should exhibit traces of previous matter written beneath, to bring the instrument within the rule.

3. The mere fact that material words of an instrument appear to have been written on paper where it previously had been blurred or defaced, might not import an alteration; but, where the words so written were

Statement of Facts.

crowded or cramped so as to fit the same space, the manifest appearance is that of an altered instrument, and the burden is on the holder to explain it.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and WILLIAMS, JJ.

No. 72 January Term 1890, Sup. Ct.; court below, number and term not given.

On March 4, 1889, an account in the estate of Christian Nagle, deceased, stated by Mary L. Nagle, executrix of James E. Nagle, deceased, who was executor of the will of Christian Nagle, was presented to the court below and confirmed nisi. Subsequently, the court appointed *Mr. P. C. Evans* auditor to examine, and, if necessary, re-state the account, and to report distribution.

Among the items of credit claimed in the account was the following : " 1888, November 19, credit for check of Christian Nagle, dated September 19, 1888, and prior to his death, but not presented to the First National Bank of Easton until after his death, in favor of James E. Nagle, for $1,422.00."

This credit was objected to before the auditor by certain legatees under the will of Christian Nagle, whereupon the accountant, after proving the genuineness of the signature of Christian Nagle, offered in evidence the following check :

No.——            EASTON, Pa., September 19, 1888.
            First National Bank.

Pay to James E. Nagle.......................or bearer, the sum of four   teenhundred$\frac{22}{100}$,.................dollars.
   $1422.00.            CHRISTIAN NAGLE.

Endorsed : JAMES E. NAGLE.

The admission of the check was objected to by the legatees " for the reason that it appeared on its face to have been altered in a material part, to wit : in the amount, and that it appeared that part of the words in said amount had been written over an erasure, and that the figure " 1 " in " 1422 " was of a darker shade than the other figures, and until the same was explained by the holder of the check, it was not admissible.

The auditor reserved the question of the admissibility of the

Auditor's Report.

offer, until all the testimony should be taken. The testimony
of several witnesses having been heard, the auditor subsequently
filed a report, which after stating the manner in which the
question arose, and citing Simpson v. Stackhouse, 9 Pa. 186;
Paine v. Edsell, 19 Pa. 178; Clark v. Eckstein, 22 Pa. 507;
Miller v. Reed, 27 Pa. 244; Hepler v. Savings Bank, 97 Pa.
420; Dean v. Warnock, 98 Pa. 566, proceeded:

The preliminary question, therefore, for your auditor to de-
termine, is whether there is an alteration in the check in dis-
pute or not. This is a question, if doubtful, as said in Clark
v. Eckstein, for the jury, and, in this case, of course, for your
auditor, to determine from an examination of the instrument.

Mr. Myers called as witnesses two gentlemen of long expe-
rience in the use of the microscope, Dr. Amos Seip and George
W. Stout, Esq., to testify as to whether or not there had been
an alteration.

Mr. Mutchler objected to this testimony as "incompetent
and irrelevant to the subject matter in dispute before the au-
ditor; that the question, as to whether the check is an altered
check or not, must be determined by the auditor himself from
an inspection of it." The testimony was taken subject to the
objection of Mr. Mutchler. Your auditor admits the testimony
and considers it as an aid to himself in determining whether
there was an alteration or not.

The microscope reveals nothing to the witnesses mentioned,
that it does not reveal to your auditor. It is evident from an
inspection even by the naked eye, that where a part of the body
of the check is written there had been an erasure; that some
part of it is blurred; and to the naked eye the "1" in "1422"
appears of a darker shade, and possibly of a different color than
the figures 422. But under the microscope, all the figures are
plainly written with ink of the same color. As Dr. Seip, on
cross-examination, says, "there is more ink in the figure '1'
than in the other figures, and consequently it looks darker."
Mr. Stout says "the '1' and the 'dot' are purple, but of a
deeper color; made with a different ink, or more put on." And
on cross-examination, he says: "I account for the difference
in color of those figures by the fact that there is more of this
substance (metalic) in the dark ones." From this testimony,
competent only as an aid to your auditor in determining the

question of as to whether there was an alteration or not, and from an inspection made by himself, both with and without the microscope, your auditor is satisfied that there is no evidence of any alterations so far as the figures 1422 are concerned.

Is there any evidence of an alteration in the body of the check, in the words " the sum of four   teenhundred$\frac{22}{100}$ " ?

Mr. Meyers asked Dr. Seip the following question: " Without reference to the condition of the check as it appears to the naked eye, state whether you discovered erasures under the glass ? " Dr. Seip answered: " I think so; that is my impression ; more particularly in the second half of the word " fourteen," etc. " The letter ' h ' in hundred, is very much blurred, and shows that the ink ran considerably; the letter ' n ', in ' hun ', is in the same condition; the word ' dred ' is heavier and darker than ' the sum of four,' " etc. " The greatest erasure is between the ' four ' and ' dred .' " On cross-examination, Dr. Seip says: " Where the letters ' teen ' are written, there is evidence of erasure, and where the letter ' n ' is, in ' hundred.' "

George W. Stout, Esq., after examining the check under the microscope, says : " The ' teen ' and ' hundred ' and the tail of the ' d ' seem to be darker than the others ; ' teen ' and ' h ' appear very much blurred, the same as it would be when you write over what has been erased or scratched. The blur appears in the whole line of the ' t,' and the ' ee,' ' n,' and ' h,' very much." He further says : " I have no doubt that this was written over an erasure. Ink always spreads in writing over an erasure. I think the paper had been erased before the words were written ; the sizing had been scratched."

Your auditor quotes this testimony to show that from a careful examination of the check in dispute by two disinterested witnesses, called by the exceptants, there is not a word as to any alteration apparent to the naked eye or revealed by the microscope. The witnesses say that they can see that the paper had been scratched, and that the ink blurred, and that it appeared to have been written over an erasure. What had been erased they do not pretend to say. It may have been a blot of ink, or the wrong word may have been written and immediately scratched out, and the ink thus blurred. It certainly does not appear, either to the naked eye or from an examination under

### Auditor's Report.

the microscope, that it was written over any particular amount previously written. In Clark v. Eckstein, 22 Pa. 507, an alteration appeared on a note as to the date from 1850 to 1851, in different ink; some scratching alongside the 0 in 1850 or the 1 in 1851, and a blacker line on the 1; as also a blot of ink on the same spot; also, that the paper had been scratched by some instrument. The note was read to the jury, notwithstanding an objection, and without any evidence explaining the alleged alteration or who made it, and the Supreme Court say: "In the present case, the last figure in the date of the note upon which the suit was brought is blotted, and there appears at its side, an erasure; but whether it was the date or the blot that was attempted to be removed was properly left to the jury as a question of fact."

Your auditor therefore says, as a question of fact, that there is no apparent alteration of the check in dispute, and admits the check in evidence, taking into consideration, as he does, all the peculiar circumstances of this particular case; being a check written by one unaccustomed to the writing of checks, as is evident by his writing " $\frac{22}{100}$ " dollars for twenty-two dollars; given by a father, an old man of considerable means, less than a month before his death, to his only son, whom he also made the executor of his will; written by the son, with the same colored ink, the son dying about a month after his father; the figures corresponding to the amount (marginal) in the body of the check, showing no erasure whatever; with nothing suspicious about a single circumstance connected with the case, excepting the fact that a part of the body of the check appears to have been written over an erasure causing the ink to spread or blur.

The accountant is therefore allowed the credit, as claimed in her account, for check of Christian Nagle to James E. Nagle, dated September 19, 1888, for fourteen hundred and twenty-two dollars, being the check in dispute.

Exceptions to the report of the auditor making distribution in accordance with his finding, having been filed by Priscilla Hess and others, legatees of Christian Nagle, deceased, after argument thereof, on October 7, 1889, the following opinion was filed, SCHUYLER, P. J.:

Opinion of Court below.

The burden of the present exceptions is that in admitting this check to a share in the distribution, the auditor committed plain error.   The defence to the check is, that as originally drawn it was for the sum of four hundred and twenty-two dollars ; that the word " hundred," in the body of the check as originally written, was erased, and " teen hundred " written over the erasure ; that the figure " 1 " was inserted between the " $ " mark and the figure " 4 " in the margin, to make the amount in figures correspond with the changed amount in the body of the check; that these alterations were made by the payee without the consent of the drawer, and that they are apparent on inspection.

There are two modes of establishing the existence of an alteration affecting the integrity of commercial paper; one by inspection alone, and the other by inspection and extraneous evidence combined.   These two modes, whilst both may be pursued in the same trial, are essentially distinct, and care should be taken not to confound them.   Where the alteration is apparent on the face of the instrument, there the burden is cast upon the holder to satisfactorily explain the alteration, failing in which the instrument stands condemned; and whether or not the alteration is apparent is a question of fact for the court.   Where, however, the alleged alteration is not apparent on the face of the instrument, no matter what circumstances of mere suspicion are thus apparent, the question of alteration or no alteration is a question of fact for the jury, to be tried as any other question of fact, with the presumption on the side of innocence ; at least we have been pointed to no decision to the contrary, and know of none.

The rule giving to an alteration apparent on the face of the instrument the effect of changing the onus probandi, it has been said is founded in reason and necessity.   This may well be, but the rule is not universally accepted, and we can easily conceive of cases where its application might work great hardship.   We think, therefore, that the rule should be held strictly, and particularly so in a case circumstanced like the present. Here the drawer of the check and the payee are both dead, and there is consequently " no party to be put to the duty of explanation : " Heffner v. Wenrich, 32 Pa. 425.   They were plain, uneducated farmers, who in all probability had never

*Opinion of Court below.*

heard of the rule under consideration. Moreover, they were father and son, and even if they knew of the rule, they would naturally be less careful to have the check free from blemishes than they would otherwise have been. Unless, therefore, the facts bring this case clearly within the rule, we think it ought not to be applied.

What are the facts,—that is to say, what are the facts disclosed by an inspection of the check, for in logical order this is the first inquiry? The check is the ordinary printed blank filled in, all the filling in being done by the same hand, which was manifestly not that of the drawer, or of an expert penman; in the line containing the words and figures "the sum of four teenhundred,$\frac{22}{100}$," the paper where the letters "teen hun" are written appears to have been scraped, but there is nothing to indicate that anything had been erased to make room for these syllables; in writing the "teen hun" the ink has spread, whilst in the other parts of the check there is no spreading of the ink; the last "d" in "hundred" touches the first "2" in "$\frac{22}{100}$," and the letters "ndred" in the same word have a crowded appearance; in the sum "\$1422.00," the figure "1" nearly touches the "\$" mark, and has a darker shade than its companions, but the difference in shade is no greater than is the same difference in the signature of the drawer of the check between the words "Christian" and "Nagle." There is nothing more in the check calling for notice.

The question is whether the foregoing facts are sufficient to cast upon the holder of the check the duty of accounting for its appearance, as a necessary condition precedent to its admission in evidence. In this connection, it is proper to observe that the rule above referred to in relation to the onus probandi is confined to cases where the blemish, of whatever nature, upon the face of the instrument, amounts to an alteration of the instrument in a material part. Some loose expressions are to be found scattered here and there in the books which vaguely intimate a broader application of the rule, but we have been pointed to no decision in support of the broader application, and we think that none can be found. Now, an alteration is defined to be "an act done upon the instrument, by which its meaning or language is changed;" 1 Greenl. Ev., § 566. Where

Opinion of Court below.

does it appear on the face of this check that it ever conveyed a different meaning, or spoke a different language from what it does to-day? It is said that the letters "teenhun" are written over an erasure. If that is so, the check does not disclose it, and at this stage of the inquiry we can look no further. All that the check shows is that the face of the paper, where these letters appear, had been scraped before the letters were written. It is admitted, that not the slightest trace of any previous matter, either written or printed, can be discovered at this point. To erase, is "to rub or scrape out, as letters or characters, written, engraved or printed; to efface, as to erase a word or a name:" Webster. The scratching or scraping of the surface of blank paper is not an erasure, in any accepted sense of that term. We think, therefore, that the learned auditor did right in receiving the check in evidence.

In so holding we are not offering a premium for dexterity in forgery. The law does not presume forgery in other cases outside of the rule we have been considering. The court is still open to the exceptants to make good their charges in the ordinary way, with the burden of proof where it naturally belongs. They have embraced the opportunity thus offered by examining as witnesses two experienced microscopists, but we agree with the learned auditor that these witnesses have revealed nothing that is not apparent without the aid of the microscope. Christian Nagle, the maker of the check, died October 15, 1888, and the check was not presented at the bank for payment until a day or two after that date. This, together with the fact that the check was filled in by the payee, was the only additional fact proved before the auditor to throw suspicion upon the check, and as an offset to it, it was shown that the payee lived eight and a half miles from the bank.

As stated above, the theory of the exceptants is, that the check was originally drawn for four hundred $\frac{22}{100}$ dollars, and that it was fraudulently altered to fourteen hundred $\frac{22}{100}$ dollars, and it cannot be denied that the ingenuity of the very able counsel for the exceptants has given to this theory a plausible look; but after all it is but theory, with no better foundation than conjecture and suspicion. The theory may be entirely correct, and then again it may be utterly false. There is noth-

ing on which the mind can rest with any sense of security. In
this respect the present case resembles Milligan's App., 97 Pa.
525, where an unsuccessful attempt was made, under circum-
stances fully as suspicious as any that we have here, to sur-
charge the accountant with some bonds, on the theory that she
had either embezzled or stolen them. In that case Mr. Justice
PAXSON uses the following language : " The only ground upon
which this surcharge can be sustained is that the accountant em-
bezzled or stole the bonds. This is a serious charge. It ought
not to be made lightly, nor without clear evidence to sustain
it. When a person is charged with crime, it matters little
what the form of the charge may be, or on which side of the
court. It is true the result is different, but the difference is
only in degree. It may be more agreeable to be branded as a
thief in the Orphans' Court, or Common Pleas, than in the
Quarter Sessions. Wherever the charge is made, its gravity
requires a careful consideration of the evidence upon which it
is founded. . . . . .' Conceding there to be circumstances of
suspicion surrounding the case, there is not enough to sustain
the verdict of a jury against the accountant, on either the civil
or criminal side of the court." The learned auditor no doubt
took the same charitable view of the present case in awarding
payment of the check in controversy, and we cannot say with
any confidence that he committed error in so doing.

—A decree having been entered dismissing the exceptions
and confirming the report, the exceptants took this appeal,
specifying for error the dismissal of the several exceptions and
the confirmation of the auditor's report.

*Mr. O. H. Meyers*, for the appellants :

1. To hold that where words, in a material part of a written
instrument, are written over an erasure and are crowded, and
where the color of the ink in one of the figures is of a darker
shade than the others, there is no apparent alteration, is con-
trary to every rule of common judgment and of evidence. The
proposition that, because the erasing was so complete that the
paper did not disclose what was originally written there, and
therefore it did not appear that the instrument ever spoke a
different language from what it does to-day, there is no appar-
ent alteration, is monstrous, and would afford appalling oppor-

tunities to perpetrate fraud. Confounding the principles that govern a case like Milligan's App., 97 Pa. 525, with those applicable to one like this, the court seems to hold that the objection to the check involves a charge of forgery, and therefore the burden is on the objector to make it good. Such a charge is not necessarily involved, for the alteration may be capable of explanation; but the policy of the law casts the burden of making the explanation on the holder.

2. The term "apparent alteration" has a more comprehensive meaning than the restricted one given it by the court below. ‣ It necessarily includes any erasures, blemishes, incongruities, crowding of words, and other appearances indicating that the instrument has been tampered with: 2 Parsons on Bills, 575–578; 1 Greenl. Ev., §§ 564, 565; 3 Phillips on Ev., 154, 156, 606, 607; Byles on Bills, 316; 1 Am. & Eng. Encyc. of Law, 514; Starkie on Ev., 455; Simpson v. Stackhouse, 9 Pa. 186; Heffner v. Wenrich, 32 Pa. 423; Marshall v. Gougler, 10 S. & R. 169; Taylor on Ev., §§ 1548, 1819; .United States v. Linn, 1 How. 104; Knight v. Clements, 8 A. & E. 215; Jackson v. Osborn, 2 Wend. 555 (20 Am. Dec. 649); Tilton v. Clinton, 7 Barb. 564; Craighead v. McLoney, 99 Pa. 215; Zeigler v. Sprenkle, 7 W. & S. 180; Garrard v. Haddan, 67 Pa. 83; 2 Phillips on Ev., 482; Taylor v. Mosely, 6 C. & P. 429; Acker v. Ledyard, 8 Barb. 514; Jordan v. Stewart, 23 Pa. 244; Leeds Bank v. Walker, L. R. 11 Q. B. 90; Hutchins v. Scott, 2 M. & W. 816; 2 Parsons on Cont., 224, note; Hurlstone on Bonds, 3 Law Lib., 4th series, 120; Herrick v. Malin, 22 Wend. 394.

*Mr. William Mutchler*, for the appellee, was not heard.

In the brief filed, counsel cited: Beaman v. Russel, 20 Vt. 205 (49 Am. Dec. 775); Craighead v. McLoney, 99 Pa. 215; Kountz v. Kennedy, 63 Pa. 190; Clark v. Eckstein, 22 Pa. 507; Robinson v. Myers, 67 Pa. 16; 1 Am. & Eng. Encyc. of Law, 497; Bank v. Hall, 1 Halst. 215.

OPINION, MR. JUSTICE CLARK:

When the check which is the subject of controversy in this case was presented to the auditor for adjudication, it was objected to, upon the ground that there was an alteration in the

Opinion of the Court.

amount; that the alteration was apparent and manifest upon
the face of the check, and that the burden was upon the hold-
er, before the check could be received in evidence, by compe-
tent proofs to explain it, and to show, either that the alteration
was made before its execution, or afterwards, with the consent
of the drawer. The auditor, however, was of opinion that the
check did not exhibit on its face any material alteration; ad-
mitting that where the alleged alterations appeared the face of
the paper had been scratched or scraped, he was not able to
discover that the amount of the check had been written over
any other amount previously written; that is to say, although
the check was manifestly blurred and disfigured at the place of
the alleged erasure, yet there was not, upon the face of the pa-
per, any apparent alteration of the amount. "The witnesses
testify," says the auditor, "that they can see that the paper
had been scratched, and that the ink blurred and appeared to
have been written over an erasure; what had been erased they
do not pretend to say; it may have been a blot of ink, or the
wrong word may have been written and immediately scratched
out, and thus the ink blurred. It certainly does not appear,
either to the naked eye, or from an examination under the
microscope, that it was written over any particular amount
previously written." The check was therefore received in
evidence, and was, without any explanation, allowed in the
distribution. The learned judge of the court below, in passing
upon the report of the auditor, says: "Now, an alteration is
defined to be an act done upon the instrument by which its
meaning or language is changed: 1 Greenl. Ev., § 566. Where
does it appear on the face of this check that it ever conveyed
a different meaning, or spoke a different language, from what
it does to-day? It is said that the letters 'teenhun' are writ-
ten over an erasure. If that is so, the check does not disclose
it, and at this stage of the inquiry we can look no further. All
that the check shows is that the face of the paper, where those
letters appear, had been scraped before the letters were writ-
ten. It is admitted that not the slightest trace of any previous
matter, either written or printed, can be discovered at this
point. To erase is 'to rub or scrape out; as letters or charac-
ters, written, engraved, or printed:' Webster. The scratching
or scraping of the surface of blank paper is not an erasure, in

any accepted sense of that term. We think, therefore, that the learned auditor did right in receiving the check in evidence."

If the rule be as stated by the learned judge, the success in completely obliterating all traces of the words of the genuine instrument, although there may be other evidences of alteration apparent, shifts the burden of proof from the party offering the paper in evidence to the party alleging the alteration. This would, in effect, we think, be to offer a premium upon the forger's skill. If there be apparent proof on the face of the paper that an alteration has been made in the place where the amount or the date of a check or note should be written, it must be supposed, prima facie, that it was the amount or the date which is altered, and that the alteration is to the prejudice of the party executing it. If this were not so, it would, in all cases, fall upon the drawer of the check or the maker of the note, in the first instance, to show what was the matter erased, before the holder is required to explain what is otherwise manifest, viz., that the instrument has been altered in a material part.

At the argument of the cause, in this court, the check was produced and submitted to our inspection; photographic copies were also provided, and we have thus been afforded the same opportunities for examination of the paper as the auditor or the court below. The mere fact that some of the words of a writing appear to have been written upon paper where it has previously been rubbed or scraped, and that the ink has run so as to create a blurred appearance, that, and no more, might not, perhaps, import any alteration, although this occurred in a material part; but the fact that an erasure has been made, where the surface of the paper has been scraped, may become apparent from various facts exhibited on the face of the paper itself; the writing upon the erased surface may be with a different pen, in different ink, or in a different hand, or the words may be crowded and cramped to fit the space originally occupied. The mere roughness of the surface is not likely to affect the general style and spacing of the words, but when certain words are erased, and others are inserted in lieu thereof, in a space either too small or too large to receive them, the alteration is usually inserted in such a cramped or crowded manner, or in such ex-

Opinion of the Court.

tended form, as to plainly indicate the alteration.  Simple faults in writing, blots, or blemishes, are, in most cases, thus readily distinguishable from an alteration in the body of the instrument, whether made fraudulently or in good faith.  That this check was scraped or rubbed, as if to erase something, is patent and plain; indeed, that is not disputed.  The sizing and a portion of the surface of the paper have been removed; at this particular place the paper is so thin that, holding it to the light, one may almost see through it; whereas, the other portions of the paper are quite perfect; the marks of an instrument with a sharp edge are plainly visible.  The allegation is that the check, originally, was for $422, (although written four hundred $\frac{22}{100}$ dollars,) and was raised to $1,422.  It is plain that the words, "the sum of four . . . . . $\frac{22}{100}$," are unaltered.  They are undoubtedly just as they were originally written.  It is very remarkable that where the writer had plenty of room, and to spare, in the line devoted to the amount, and he started out apparently to occupy it, that he should stop at the place of the erasure, in the middle of a word, and from that point cramp and crowd the words or letters, as if the space was limited.  It will be observed, also, that the crowding of the letters, and contracting of the spaces, is confined to the place where the paper was scraped; that the space covered by the alleged erasure is just sufficient to contain the word "hundred" with the usual spacing, and the letters "dred" appear to be written upon the space between the "$\frac{22}{100}$" and the word preceding, where no erasure was made; that after the word "four" there is apparent a remnant of the matter erased, and that the letters "teen" appear to have had no connection with "four" until after the erasure, the hair-line finish of the "r" having been formed as if that letter was the last one of the word.  It is also a singular coincidence that the figure "1," in the figures on the corner, denoting the amount of the check, is very close to the ($) dollar mark, and is of a much darker shade or color than either of the other figures, which are alleged to have been made at the same time, with the same ink, and the same pen.  The general appearance is that of an altered paper.  The alteration, we think, is manifest and apparent at the first glance, and a critical and careful examination confirms this impression.  The alteration may have been made at the time, with the knowl-

*Opinion of the Court.*

edge and approval of the parties; but, as the writing, including the alteration, is in the hand of the payee, it is the duty of the holder to explain it. It is unimportant that both parties to the transaction are dead; an explanation is thereby rendered more difficult, perhaps, but the security and safe transmission of negotiable paper demand that the rule so well established in our decisions shall be maintained. The maker of negotiable paper is always presumed, in the absence of evidence, to have issued it clear of all blemishes, erasures, and alterations, and the burden of showing that it was defective when issued is upon the holder : Heffner v. Wenrich, 32 Pa. 423. As a general rule, the law presumes in favor of innocence, but this presumption does not extend to the alteration of negotiable instruments. "He who takes a blemished bill or note, takes it with all its imperfections on its head. He becomes sponsor for them, and, though he act honestly, he acts negligently. But the law presumes against negligence as a degree of culpability; and it presumes that he had not only satisfied himself of the innocence of the transaction, but that he had provided himself with the proofs of it, to meet a scrutiny he had reason to expect." Simpson v. Stackhouse, 9 Pa. 186. To the same effect are Paine v. Edsell, 19 Pa. 178; Clark v. Eckstein, 22 Pa. 507; Miller v. Reed, 27 Pa. 244; and many other cases.

The distinction as to the province of the court and of the jury, excepting as it may involve the question of the burden of proof, is rendered unimportant, by the fact that the auditor in the first instance, and the learned judge afterwards, performed the functions of both court and jury. The check was not only received in evidence, but it was allowed in the distribution, without any explanation whatever. We are of opinion that the decree in this case cannot be sustained.

> The decree of the Orphans' Court is therefore reversed, and the record remitted for further proceedings; the appellee to pay the costs of this appeal.